IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY TERESA ARTHUR, *et al.*, | No. C 11-435 SI |
| Plaintiffs, | **ORDER DENYING DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| JPMORGAN CHASE BANK, N.A., *et al.*, | |
| Defendants. | |

Defendant Northwest Trustee Services, Inc. has filed a motion to dismiss the first amended complaint. The motion is scheduled for a hearing on May 20, 2011. Plaintiffs, who are *pro se*, have not filed an opposition to the motion. Pursuant to Civil Local Rule 7-1(b), the Court determines that the matter is appropriate for resolution without oral argument, and VACATES the hearing. For the reasons set forth below, the Court DENIES defendant's motion to dismiss.

**BACKGROUND**

Plaintiffs are Mary Teresa Arthur and her husband, Staff Sergeant Dominic Arthur. The first amended complaint alleges that Sgt. Arthur was called to duty under Presidential orders in support of Operation Iraqi Freedom with the California National Guard, and that Sgt. Arthur's active duty service began on April 19, 2008 and ended on July 14, 2009. FAC ¶ 20. The complaint alleges that Sgt. Arthur's civilian employer did not provide continuing income during his military service, and therefore his income during his military service was significantly lower than his civilian income. *Id.* ¶ 29. The complaint alleges that the reduction in Sgt. Arthur's income had a material impact on plaintiffs' ability to pay the mortgage on two deeds of trust on their residence at 728 Bridge Creek Drive, San Ramon,

California. *Id*. ¶¶ 1, 29.

The FAC alleges that during Sgt. Arthur's active duty service, plaintiffs qualified for relief, such as lowered interest rates and deferral of mortgage payments, under the Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. App. §§ 501 *et seq*., and California Military and Veterans Code §§ 389 *et seq. Id*. ¶ 27. The complaint alleges that Mrs. Arthur repeatedly sent letters to JPMorgan requesting relief under these statutes, and that JPMorgan either did not respond or denied her requests. *Id*. ¶¶ 40-41, 43-44, 46.

The complaint also alleges that after JPMorgan denied Mrs. Arthur's requests for military relief, Mrs. Arthur attempted to obtain a loan modification. According to the complaint, between January 1, 2009 and June 14, 2009, Mrs. Arthur submitted at least 12 written loan modification applications to JPMorgan. *Id*. ¶ 53. The complaint alleges that during this same time period, JPMorgan both (1) sent Mrs. Arthur an average of 2 solicitation letters per month offering loan modification assistance, and (2) "inundated Mrs. Arthur with persistent collection calls and letters, including multiple payment demands within a single week." *Id*. at 50. The complaint alleges that Mrs. Arthur explained the situation to regarding her husband's deployment and previous requests for military relief benefits to JPMorgan to no avail. *Id*.

The complaint alleges,

> After submitting copious loan modification applications, Mrs. Arthur spoke to numerous JPMorgan customer service representatives regarding the status of the applications. Repeatedly JPMorgan advised Mrs. Arthur the financial documentation submitted by Plaintiffs had not been received or was lost and must be resubmitted. On multiple occasions JPMorgan said documentation had been received then later claimed the same documentation had not been received. Plaintiffs' records indicate the fax transmissions to the phone numbers provided by JPMorgan completed successfully. JPMorgan could not provide information on the whereabouts of the missing documentation so Plaintiffs are left to worry about the security of their personal financial information. Still, Mrs. Arthur resubmitted documentation whenever required to do so by JPMorgan.

*Id*. ¶ 57.

According to the complaint, between October 2008 and May 2009, plaintiffs were "forced to drain their financial resources including credit cards and 401k accounts, as well as borrow money from family to meet JPMorgan's payment demands." *Id*. ¶ 59. The complaint also alleges that plaintiffs' relationship was placed under enormous strain, and that both plaintiffs experienced extreme mental and

2

emotional distress. *Id*. ¶¶ 59, 65-68. "By June 2009, Mrs. Arthur had lost 30 pounds and 60% of her hair, and suffered from anxiety, clinical depression, impaired cognitive functioning, irritability, insomnia, fatigue, headaches, tachycardia (rapid heart rate), and ophthalmopathy (a condition whereby eyes protrude from the sockets and water excessively)." *Id*. ¶ 65. The complaint alleges that at the end of June 2009, Mrs. Arthur was diagnosed with Graves Disease, an auto-immune disease believed to be caused by severe emotional stress. *Id*. ¶ 66. The complaint also alleges that Sgt. Arthur "suffered from insomnia, anxiety, irritability, depression, and the constant threat of his family losing their home, all while trying to disarm bombs in a combat zone." *Id*. ¶ 67.

The complaint alleges that as of July 2009, plaintiffs were one month behind on their first deed of trust, and current on the second deed of trust. *Id*. ¶ 70. In September 2009, JPMorgan informed Mrs. Arthur that the first deed of trust had been approved for a "Trial Plan Agreement" with the Chase Modification Program; under that program, the "modified" monthly payment was $413.25 higher than the original payment, and there was no provision to modify the second deed of trust. *Id*. ¶¶ 72-73. Mrs. Arthur contacted JPMorgan customer service and advised them that the Trial Plan Agreement was not acceptable. *Id*. ¶ 74. Mrs. Arthur was told to submit a new loan modification application. *Id*. Plaintiffs submitted another application for both loans. *Id*. Mrs. Arthur continued to follow up on plaintiffs' loan modification applications, and JPMorgan and Chase did not provide any additional information regarding plaintiffs' applications and/or requests for military relief benefits. *Id*. ¶ 76.

On December 28, 2009, defendant Law Offices of Cherin & Yelsky ("C&Y") recorded a Notice of Default and Election to Sell Under Deed of Trust at the Contra Costa County Recorder's Office for default on the second deed of trust in the amount of $4,125.98. *Id*. ¶ 78, Ex. C. The complaint alleges that SCRA § 533(c) specifically prohibits non-judicial foreclosures of property owned by a servicemember or their dependents during a servicemember's active duty plus nine months after the servicemember's release from active duty. *Id*. ¶ 80.

On March 9, 2010, defendant California Reconveyance Company ("CRC") recorded a Notice of Default at the Contra Costa County Recorder's Office for default under the first deed of trust in the amount of $33,888.92 as of March 1, 2010. *Id*. ¶ 81. On April 13, 2010, C&Y recorded a Notice of Trustee's Sale at the Contra Costa County Recorder's Office for default on the second deed of trust.

3

**United States District Court**
For the Northern District of California

The notice stated that a trustee's sale was scheduled for May 6, 2010. *Id*. ¶ 82. On April 19, 2010, Mrs. Arthur contacted Chase customer service and requested foreclosure protection pursuant to SCRA § 553. *Id*. ¶ 84. That same day, Mrs. Arthur also submitted a written request for foreclosure protection pursuant to SCRA § 553 to JPMorgan, Chase and C&Y. *Id*. ¶ 85.

After further correspondence with C&Y, including Mrs. Arthur sending to C&Y a draft copy of a complaint that she was preparing, C&Y agreed to postpone the trustee's sale. *Id*. ¶¶ 87-90. On May 20, 2010, Mr. Yelsky of C&Y advised Mrs. Arthur in an email that "the bank has told me to cancel you[r] sale." *Id*. ¶ 91.

In a letter dated June 1, 2010, JPMorgan and Chase informed Mrs. Arthur that the first deed of trust account had been set up for SCRA benefits, and that a 6% interest rate cap would be applied retroactively to February 1 2008. *Id*. ¶ 93. However, according to the complaint, Mrs. Arthur had not requested the 6% interest rate cut, but instead had requested a deferral of loan payments. *Id*. The complaint further alleges that the SCRA benefit that JPMorgan and Chase provided to plaintiffs did not meet the requirements of SCRA because the statute specifies that the 6% interest rate limit is effective as of the date on which the servicemember is called to military service, and Sgt. Arthur was called to duty on January 4, 2008. *Id*. ¶ 95.

On June 8, 2010, CRC recorded a Notice of Rescission of Declaration of Default and Demand for Sale and of Notice of Breach and Election to Cause Sale at the Contra Costa County Recorder's Office. *Id*. ¶ 97. In a letter dated June 14, 2010, Chase notified Mrs. Arthur that a new form was needed in order to complete the loan modification applications. *Id*. ¶ 98. Mrs. Arthur submitted the requested forms on June 20, 2010 and again on July 6, 2010. *Id*.

On August 27, 2010, defendant Northwest Trustee Services, Inc. ("NWTS") recorded a Notice of Default at the Contra Costa County Recorder's Office for default on the second deed of trust in the amount of $45,118.40 as of August 25, 2010. *Id*. ¶ 102. On September 17, 2010, NWTS mailed a copy of the Notice of Default to Mrs. Arthur by certified mail. The complaint alleges that Cal. Civ. Code § 2924b(b)(1) requires that a trustee send a copy of the Notice of Default within 10 business days following recordation, to each trustor by registered or certified mail, and that Cal. Civ. Code § 2924b(e) requires the trustee to mail an additional copy of the required notice to each trustor by first-class mail

4

in accordance with § 2924b(b)(1). *Id.* ¶¶ 103-04. The complaint alleges that NWTS mailed a copy, and an additional copy, of the NOD to Mrs. Arthur 21 days after it was recorded. *Id.* The complaint also allege that the Notice of Default contained a "Declaration of Compliance (California Civil Code Section 2923.5(b))" stating that the "mortgagee, beneficiary or authorized agent tried with due diligence but was unable to contact the borrower to discuss the borrower's financial situation and to explore options for the borrower to avoid foreclosure . . .", but that JPMorgan and Chase did not contact Mrs. Arthur as claimed in the declaration. *Id.* ¶¶ 105-06.

On January 4, 2011, a Notice of Trustee's Sale was taped to the front door of plaintiffs' property specifying a trustee's sale set for January 28, 2011. *Id.* ¶ 107. On January 4, 2011, Mrs. Arthur contacted NWTS and spoke to Daniel Schneider in the Foreclosure Department. *Id.* ¶ 108. "Mrs. Arthur explained to Mr. Schneider her understanding that foreclosure proceedings against the Plaintiffs were to be stopped while the Plaintiffs' MHA applications were being processed. Mrs. Arthur provided Mr. Schneider with an overview of the interactions with JPMorgan and Chase prior to NWTS' recording of the NOD." *Id.* On the same day, Mrs. Arthur sent a written notification to Mr. Schneider requesting a postponement of the trustee's sale, reiterating the information she had provided to him orally and including supporting documentation, and informing NWTS that the Declaration of Compliance with Cal. Civ. Code § 2923.5(b) was not correct. *Id.* ¶ 109.

On January 11, 2011, NWTS recorded the Notice of Trustee's Sale with the Contra Costa County Recorder's Office for default on the second deed of trust for a total unpaid obligation of $261,031.15. *Id.* ¶ 110. The complaint alleges that Cal. Civ. Code § 2924f(b)(1) requires the Notice of Trustee's Sale to be recorded at least 20 days prior to the sale date, and that NWTS recorded the Notice 17 days prior to the sale. *Id.* ¶ 111. The complaint also alleges that NWTS mailed a copy, and an additional copy, of the Notice 18 days prior to the sale, in violation of Cal. Civ. Code §§ 2924b(b)(2) and 2924b(e). *Id.* ¶¶ 113-14.

On January 11, 2011, Mrs. Arthur also received a Substitution of Trustee substituting NWTS for the original trustee under the second deed of trust. *Id.* ¶ 115. The complaint alleges that "[t]he Substitution of Trustee appears to be backdated and/or falsified in that the signature date by Melissa Myers, Authorized Signatory, is August 25, 2010 while the notary's acknowledgment is dated January

4, 2011." *Id*. ¶ 115. The complaint alleges that "NWTS could not, in good faith, have made such a representation." *Id*. ¶ 116. The complaint also alleges,

> While failing to perform its statutory duties, NWTS went beyond its scope of duties as trustee by actively advertising the Trustee's Sale of Plaintiffs' Property on the NWTS web site. NWTS posted the Property's full address and a photograph of the Property taken by NWTS on the NWTS web site. NWTS further designated the Plaintiffs' Property as a "Hot Property" by highlighting the Property's listing with a "flame" icon presumably to publicize the Property's desirability. Plaintiffs were unable to locate the criteria used to establish a "Hot Property" but of the 617 properties recently listed for sale in Contra Costa County, only 2 properties were designated as a "Hot Property."

*Id*. ¶ 117.

The complaint also alleges that there is a very large discrepancy in the default amounts stated on the Notices of Default recorded by C&Y and NWTS. The Notice of Default recorded by C&Y in December 2009 specifies a default amount of $4,125.98 compared to $45,118.40 specified in the Notice of Default recorded 8 months later by NWTS. *Id*. ¶ 118.

Plaintiffs, who are *pro se*, filed this lawsuit on January 28, 2011. Plaintiffs filed a first amended complaint on April 7, 2011. On April 8, 2011, defendant NWTS filed a motion to dismiss the first amended complaint. On May 3, 2011, the parties, including NWTS, filed a joint stipulation stating that plaintiffs and defendant Chase were engaged in ongoing settlement negotiations and "settlement could be reached without requiring the Court's intervention." Docket No. 27 at 2:6-8. The stipulation stated that in light of these negotiations, the parties agreed that it was appropriate to extend the time for defendants to respond to the complaint until June 8, 2011. *Id*. at 2:11-14. The stipulation also noted that NWTS had filed a motion to dismiss, without specifying the effect of the stipulation on the pending motion to dismiss. The parties also filed a separate stipulation agreeing to reschedule the case management conference in light of the parties' settlement negotiations. Docket No. 25. In response to a query from the Court's Clerk, counsel for NWTS informed the Court that its motion to dismiss the complaint was not being continued.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss,

6

the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that 'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

**DISCUSSION**

NWTS is named in the seventh and thirteenth causes of action. The seventh cause of action alleges that NWTS violated California Business and Professions Code § 17200, and the thirteenth claim seeks injunctive relief. NWTS moves to dismiss the claims against it on the following grounds: (1) under the § 17200 claim, the complaint alleges that NWTS violated various sections of Cal. Civ. Code § 2924 but plaintiffs do not specify exactly which provisions NWTS allegedly violated; (2) plaintiffs' allegation that NWTS violated the statute requiring the recording of the Notice of Trustee's Sale 20 days prior to the sale date fails because no sale has occurred; (3) the complaint does not allege specific facts showing which business practices by NWTS were unlawful or unfair; (4) the complaint alleges NWTS engaged in misrepresentations, but those allegations are not pled with specificity as required by Federal Rule of Civil Procedure 9(b); (5) the claim for injunctive relief fails because any injunctive relief

7

1 ordered by the Court must be ordered against the beneficiary under the Deed of Trust, and NWTS is
2 merely the trustee; and (6) NWTS is immune under Cal. Civ. Code § 47(b) because "[t]here are no
3 allegations, nor is there any evidence, that NWTS did, or did not do, anything outside the normal course
4 and scope of its duties as Trustee." Motion at 9:24-26.

5       The Court finds that NWTS's arguments are without merit and DENIES the motion to dismiss.
6 Although the portion of the complaint alleging the § 17200 claim does not specify which sections of Cal.
7 Civ. Code § 2924 NWTS allegedly violated, that claim incorporates all previous paragraphs of the
8 complaint, and earlier in the complaint plaintiffs do allege the specific code violations. *See, e.g.*, FAC
9 ¶¶ 103-106, 113-118. NWTS does not cite any authority for the proposition that there is no violation
10 of the notice requirements of Cal. Civ. Code §§ 2924f(b)(1) and 2924b(b)(2) simply because the sale
11 does not actually occur, and there is nothing in the language of those statutes suggesting NWTS is
12 correct.

13       The Court also rejects NWTS's assertions that the complaint lacks specificity. The complaint
14 specifically identifies the allegedly unfair and/or unlawful acts by NWTS, as well as the alleged
15 misrepresentations in the Notices filed by NWTS. NWTS characterizes plaintiffs' § 17200 claim as one
16 for fraud. The Court disagrees that the § 17200 claim sounds in fraud, as the gravamen of that claim
17 against NWTS is that NWTS violated the statutory requirements set forth in Cal. Civ. Code § 2924.

18       Finally, with regard to NWTS's arguments that it is simply a trustee and is immune, the Court
19 finds that the complaint alleges facts sufficient to maintain claims against NWTS. The authority cited
20 by NWTS, *Kachlon v. Markowitz*, 168 Cal. App. 4th 316 (2008), is distinguishable because *Kachlon*
21 was decided after a trial, and thus the Court of Appeal reviewed the factual record to conclude that the
22 trustee was entitled to immunity. *See id.* at 343-34 ("No evidence suggested that [the trustee] acted with
23 ill will or with reckless disregard for the truth of the notice of default. Before recording the notice of
24 default, it obtained a trustee's sale guaranty indicating that the deed of trust was still of record, and that
25 no prior reconveyance had been recorded. After being presented with documentation showing that the
26 underlying debt had been paid, Best Alliance took no further action to enforce the foreclosure. Nothing
27 remotely suggests that Best Alliance acted with malice. Thus, the trial court properly concluded that
28 Best Alliance's conduct constituted privileged communications, and properly relieved it of liability for

the Markowitzes' slander of title and negligence claims.").

## CONCLUSION

For the foregoing reasons, the Court DENIES NWTS's motion to dismiss the complaint. Docket Nos. 16 & 28.

**IT IS SO ORDERED.**

Dated: May 17, 2011

SUSAN ILLSTON
United States District Judge